UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| OCEANA, INC., | Case No. 21-cv-05407-VKD |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART OCEANA, INC.'S MOTION TO COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD** |
| GINA RAIMONDO, et al., | |
| Defendants. | Re: Dkt. No. 25 |

In this action, plaintiff Oceana, Inc. ("Oceana") challenges a final agency action, the National Marine Fisheries Service's ("NMFS") approval of Amendment 18 to the Coastal Pelagic Species Fisheries Management Plan. Dkt. No. 1 ¶¶ 1–12. Amendment 18 is a rebuilding plan for the Pacific sardine. *Id.* ¶ 76. Oceana brings its challenge pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq., the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321. Pursuant to Civil Local Rule 16-5, defendants prepared and filed an administrative record ("AR") with the Court on September 9, 2021. Dkt. No. 12. Before the Court is Oceana's motion to compel defendants to complete the administrative record. Dkt. No. 25. Defendants oppose the motion. Dkt. No. 28.

All parties have consented to magistrate judge jurisdiction. Dkt. Nos. 8, 15. Having considered the parties' submissions and arguments made at the hearing on the motion, the Court grants in part and denies in part Oceana's motion to compel completion of the administrative record.

United States District Court
Northern District of California

## I.  BACKGROUND

Oceana is a non-profit environmental advocacy organization dedicated to protecting and restoring the world's oceans.  Dkt. No. 1 ¶ 20.  Oceana has over 1.3 million members who use and enjoy the oceans for recreational, commercial, and scientific reasons.  *Id.* ¶¶ 20–23.

Defendants are NMFS, Gina Raimondo, sued in her official capacity as Secretary of Commerce, and the National Oceanic and Atmospheric Administration, a federal agency with supervisory responsibility for NMFS.  *Id.* ¶ 24.  NMFS is an agency of the United States Department of Commerce that has been delegated the primary responsibility to ensure that the requirements of the MSA and other applicable laws are followed and enforced.  *Id.*

Congress enacted the MSA to prevent overfishing and to ensure that "fisheries [are] conserved and maintained so as to provide optimum yields on a continuing basis."  16 U.S.C. § 1801(a)(5).  The MSA establishes eight regional fishery management councils, each of which is charged with developing a "fishery management plan" for the fisheries in its region.  *Id.* § 1852(a)(1), (h)(1).  Once a council develops a plan or amendment to a plan, the Secretary of Commerce must evaluate it and any proposed regulations.  *Id.* § 1854(b)(1).

Under the MSA, fishery management plans must contain conservation measures to prevent overfishing, rebuild overfished stocks, and achieve the optimum yield from each fishery.  Dkt. No. 1 ¶¶ 27–30 (citing 16 U.S.C. §§ 1851(a)(1)(A), 1801(b)(4), 1851(a)(1)).  Such measures must be "based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  Each fishery management plan must establish a mechanism for specifying annual catch limits and other specifications such that overfishing does not occur.  16 U.S.C. § 1853(a)(15).  If any fishery is determined to be overfished, the MSA requires that, within two years of this determination, the appropriate council must develop a rebuilding plan to end the overfishing "immediately" in a time that is "as short as possible" (generally not to exceed 10 years).  16 U.S.C. §§ 1854(e)(3)(A); 1854(e)(4)(A)(i)–(ii); 50 C.F.R. § 600.310(j)(3)(i).

NMFS, as a federal agency, is also bound by the NEPA and its implementing regulations.  42 U.S.C. § 4332; 40 C.F.R. § 1500.3.  Under the NEPA, federal agencies must prepare an environmental impact statement for any major federal action significantly affecting the human

1   environment.  42 U.S.C. § 4332(2)(c).  If an action's environmental impact is unknown, the

2   agency must prepare an environmental assessment.  40 C.F.R. § 1501.3(a)(2).  If the

3   environmental assessment demonstrates that the action is likely to significantly affect the

4   environment, the agency must prepare an environmental impact statement; otherwise, the agency

5   must prepare a finding of no significant impact.

6        On July 9, 2019, NMFS officially notified the Pacific Fisheries Management Council

7   ("PFMC" or "Council") and the public that the Pacific sardine was overfished.  Dkt. No. 1 ¶ 75;

8   AR 6.  After this designation, the agency, in collaboration with the Council, developed a

9   rebuilding plan for the Pacific sardine.  *Id.* ¶ 76; AR 6–7.  The Council considered a range of

10   rebuilding alternatives at its June 2020 meeting, analyzed a final set of three alternatives, and

11   selected its preferred alternative (titled "Status Quo Management") at its September 2020 meeting.

12   AR 6–7.  The rebuilding plan, which became Amendment 18 to the Coastal Pelagic Species

13   Fishery Management Plan ("CPS FMP"), identifies a minimum timeframe for rebuilding of 12

14   years, a target timeframe of 14 years, and a maximum timeframe of 24 years.  AR 7.  The plan

15   also identifies a biomass level of 150,000 metric tons as the rebuilding target.  *Id.*

16        In this action, Oceana alleges that NMFS's decision to adopt Amendment 18 as the

17   rebuilding plan for the Pacific sardine population violates the APA, the MSA, and the NEPA.

18   Dkt. No. 1.  According to Oceana's allegations, NMFS failed to specify a reasonable rebuilding

19   target for the Pacific sardine population and demonstrate that that target is attainable based on the

20   best available science, in violation of the APA and the MSA.  *Id.* ¶¶ 133-148.  Further, Oceana

21   alleges that Amendment 18 will not prevent overfishing, in violation of the APA and the MSA.

22   *Id.* ¶¶ 149-154.  Oceana also alleges that NMFS violated the APA and the NEPA by failing to

23   sufficiently analyze the impact of its action on the environment and marine predators dependent on

24   sardines and by failing to prepare an environmental impact statement.  *Id.* ¶¶ 155-174.  Finally,

25   Oceana alleges that NMFS failed to analyze and minimize the impact of its action to essential fish

26   habitat, in violation of the APA and the MSA.  *Id.* ¶¶ 175-179.

27        Oceana now asks the Court to compel NMFS to complete its production of the

28   administrative record by including several categories of materials.  Dkt. No. 25.  It argues that the

United States District Court
Northern District of California

administrative record filed on September 2, 2021 is incomplete because it does not include all the documents and information that were before NMFS and directly or indirectly considered by the agency in approving Amendment 18.  Dkt. No. 25 at 7–16.  Oceana further argues that the administrative record is incomplete because NMFS improperly withheld material it labeled "deliberative."  Dkt. No. 25 at 18–21.  In the alternative, Oceana asks the Court to supplement the record with these materials under an exception to the record review rule.  Dkt. No. 25 at 22–25.

## II.    LEGAL STANDARD

The APA authorizes courts to review and set aside agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  "Generally, judicial review of an agency action is limited to review of the record on which the administrative decision was based."  *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).  Courts may grant a motion to complete the administrative record where the agency has not submitted the "whole" record.  *See* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party.").

"The whole record includes everything that was before the agency pertaining to the merits of its decision."  *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir. 1993).  This includes "all documents and materials directly or indirectly considered by agency decision-makers and . . . evidence contrary to the agency's position."  *Thompson*, 885 F.2d at 555; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (holding that courts must review "the full administrative record that was before the [agency] at the time [it] made [the] decision").  An agency may not exclude information it considered on the grounds that it did not rely on that information.  *Oceana, Inc. v. Pritzker*, No. 16-cv-06784-LHK (SVK), 2017 WL 2670733, at *2 (N.D. Cal. Jun. 21, 2017) (citation omitted).  "[D]ocuments need not have 'literally passed before the eyes of the decision-makers' in order to be part of the administrative record, . . . a decision-maker can be deemed to have 'constructively considered' materials that, for example, were relied upon by subordinates or materials upon which a report that was considered rely heavily."  *Id.* at *4 (citation omitted).

The agency's designation of the record is accorded a strong presumption of regularity and

United States District Court
Northern District of California

completeness, which the plaintiff must overcome with "clear evidence." *Portland Audubon Soc'y*, 984 F.2d at 1548. To meet this standard, the plaintiff must identify the allegedly omitted materials with sufficient specificity and "identify reasonable, non-speculative grounds for the belief that the documents were considered by the agency and not included in the record." *Oceana*, No. 16-cv-06784-LHK (SVK), 2017 WL 2670733, at *2; *City of Duluth v. Jewell*, 968 F. Supp. 2d 281, 288 (D.D.C. 2013).

## III.    DISCUSSION

Oceana argues that NMFS improperly omitted from the administrative record three types of documents: (1) data and scientific evidence before the agency at the time it made its decision; (2) Council meeting documents discussing previous management decisions that directly informed and affected the agency's decision to re-adopt existing management measures as a rebuilding plan in Amendment 18; and (3) documents, emails, meeting notes, drafts, and other internal and external communications that the agency considers "deliberative." Dkt. No. 25 at 3. In its briefing, Oceana groups the materials it seeks into five categories, many of which overlap: (1) documents related to the models the agency used; (2) documents related to overfishing and stock assessments from the past decade; (3) documents related to various parameters used in agency models; (4) documents related to a previous amendment to the CPS FMP; (5) documents the agency considers "deliberative."

For purposes of this order, the Court first considers NMFS's discussion of how it developed the rebuilding plan—i.e. the agency decision at issue. Then the Court addresses the categories of documents Oceana says NMFS should include in the administrative record.

### A.    NMFS's Development of a Rebuilding Plan

Before addressing Oceana's requests for additions, it is necessary to consider how the adoption of Amendment 18 modifies the Coastal Pelagic Species Fishery Management Plan.

After NMFS declared the Pacific sardine "overfished" in 2015, the agency began developing a rebuilding plan, which it describes in its opposition brief as follows:

> The Council and NMFS began developing a rebuilding plan that would meet the requirements of the MSA and [National Standard #1 ("NS")] Guidelines. This began with the Southwest Fisheries

Science Center's development of a model, known as the Rebuilder, to predict rebuilding times. The Council and NMFS completed an environmental assessment ("EA") pursuant to the National Environmental Policy Act ("NEPA") evaluating three alternative rebuilding plans and assessing their environmental effects, likely rebuilding times as determined by the Rebuilder model, and compliance with MSA and NS requirements. Ultimately, the Council concluded that the current specifications process,[1] in combination with the mandatory closure of the primary directed commercial fishery and reductions in incidental harvest allowances, would rebuild the stock in the least amount of time possible, taking into account the needs of fishing communities and sardine's interaction with the marine ecosystem. NMFS approved the Council's recommendation and amended Section 4.5 of the FMP to create the framework for future specifications during the rebuilding period.

Dkt. No. 28 at 4-5 (citations omitted).

The parties agree that the adoption of Amendment 18 maintained status quo fishery management measures.  Dkt. No. 25 at 2; Dkt. No. 28 at 13 ("Amendment 18 relied heavily upon management measures put in place after 2014 for its conclusion that status quo management would rebuild the stock.").  The amendment is reflected in Section 4.5 of the CPS FMP, which describes the rebuilding plan as follows: "[t]otal catch limits . . . will be set annually based on annual stock assessments and the *control rules in the FMP* and recommendations from the [scientific and statistical committee] . . . ."  AR 3072 (emphasis added).  The "control rules" of the rebuilding plan are contained in an adjacent section, Section 4.6 of the CPS FMP, discussed further below.  *See* AR 5474 [CPS FMP through Amendment 17]; *see also* Dkt. No. 28 at 14 ("The formula for setting [the annual overfishing limit] for sardine is found in Section 4.6 of the FMP.").

In September 2020, the PFMC held their fourth of five annual meetings.  AR 4438.  A key agenda item at that meeting was to "Adopt a Final Preferred Alternative for a Pacific Sardine Rebuilding Plan."  *Id.*  In preparation for adoption of the rebuilding plan, a subset of the Council, the Coastal Pelagic Species Management Team,[2] prepared a preliminary environmental analysis

---

[1] "Annual specifications set the catch limits and management measures for each year."  Dkt. No. 28 at 12.

[2] Four of the nine members of the CPSMT are NMFS representatives.  *Membership Roster*, PFMC (October 11, 2022), https://www.pcouncil.org/documents/2022/10/full-roster.pdf/#page=9 (last visited: November 7, 2022).

which they shared with meeting participants.  AR 4451-81.  This analysis summarizes management of the Pacific sardine through the use of harvest control rules:

> Management of Pacific sardine is accomplished through an annual assessment and management specifications process to calculate the annual overfishing limit (OFL), the acceptable biological catch (ABC), the annual catch limit (ACL) and the primary directed fishery harvest guideline (HG) for the U.S. commercial fishery and adopt management measures. Management measures are set at the April Council meeting using . . . control rules.

AR 4455.  The harvest control rules are a set of equations, based in part on environmental variables, that determine the OFL, ABC, ACL, and HG.  *See id.*  One of the harvest control rules, the primary directed fishery harvest guideline (HG), directly ties the biomass of sardine to the status of the primary directed fishery.  *See id.*  To create this relationship between biomass and the primary directed fishery, this control rule includes a discretionary parameter labeled CUTOFF:

> Unique to the HG control rule is the CUTOFF parameter. This term reduces the fishable biomass of sardine by 150,000 mt and is intended to serve as a safeguard to protect the spawning stock, making it available for rebuilding if the stock becomes overfished. If biomass falls to or below 150,000 mt the computed HG is zero and the primary directed sardine fishery is prohibited.
>
> The Pacific sardine stock was first projected to fall below CUTOFF on July 1, 2015 and has remained below CUTOFF since that time. Consequently, there has not been a primary directed fishery in U.S. waters since 2015. In the intervening years as specified in the FMP, with the HG equaling zero, Pacific sardine harvest has been managed under the OFL/ABC control rules, and with ACLs and annual catch targets (ACTs).

*Id.* The sardine management summary describes the "implicit" features and aspects of the rebuilding plan:

> The CPS FMP does not include explicit rebuilding requirements and instead includes management approaches wherein features or aspects of a rebuilding plan are implicit. For example existing Pacific sardine management incorporates such features: the primary directed fishery for sardine is closed at a level when estimated biomass is three times the level at which the stock is deemed overfished, and this is accomplished through automatic actions due to the CUTOFF parameter in the HG control rule; and, provisions in the CPS FMP that automatically reduce the incidental allowance of sardine in other CPS directed fisheries when the stock is overfished. Thus, management actions the Council might otherwise need to undertake such as closures of major fisheries and restrictions on incidental catch when a stock is declared overfished are hardwired for Pacific sardine.

1    AR 4456.  The environmental analysis prepared by the Council explains the available alternatives

2    for rebuilding the sardine:

> Key steps or actions that might be considered under a rebuilding
> plan to modify fishing activities in an attempt to rebuild the stock
> have already been implemented in the Pacific sardine fishery.
> Notably, the primary directed commercial fishery has been closed
> for five years, consistent with [northern subpopulation] stock
> biomass falling below the CPS FMP's CUTOFF value of 150,000
> mt. . . . Alternative 1 maintains the management process, [harvest
> control rules], and other FMP provisions currently in place for the
> [northern subpopulation] of Pacific sardine.

8    AR 4458-59.

9        **B.    Documents Relating to Harvest Control Rules**

10       Oceana argues that the record should include documents that discuss and analyze the

11   merits of the pre-existing harvest control rules (such as the OFL, ABC, ACL, and HG) or their

12   underlying parameters.  Dkt. No. 25 at 9 (Section IV.A), 12-16 (Section IV.C).  NMFS[3] responds

13   that the rebuilding plan reflects a set of independent decisions and that the harvest control rules are

14   outside the scope of Amendment 18.  Dkt. No. 28 at 14-15.  It says that Oceana fails to identify a

15   "critical connection" between the documents it seeks to add and the issuance of Amendment 18.

16   *Id.* at 7 ("While Plaintiff has argued that all of these documents were before NMFS or the Council

17   at some point in the last few decades, they have not shown that these documents were "before" the

18   agency *with regard to the issuance of Amendment 18*. Without this critical connection to the actual

19   action being reviewed in this litigation, Plaintiff has failed to meet its burden.") (emphasis in

20   original).  In fact, NMFS insists that the merits of the pre-existing harvest control rules were *not*

21   directly considered: "Plaintiff is arguing that NMFS should have reconsidered the [harvest control

22   rule] parameters. . . . But that Plaintiff thinks NMFS should have reconsidered them, does not

23   mean that NMFS did. At the outset, in adopting the rebuilding plan, NMFS did not change the

24   formula for setting OFL. Amendment 18 only amended Section 4.5 of the FMP."  *Id.* at 14.  For

25   this reason, NMFS argues, any documents addressing the harvest control rules should not be part

26   of the record.  Oceana counters that even if the harvest control rules and their underlying

27

28   ───────────────

[3] For convenience, this order refers to "NMFS" instead of "defendants" in discussing defendants' positions.

United States District Court
Northern District of California

1  parameters were not directly considered in the adoption of the rebuilding plan, they were

2  necessarily indirectly considered because Amendment 18 presumes that these control rules are

3  valid and effective to achieve the MSA's objectives.  Dkt. No. 31 at 1-2, 7, 10.  The Court agrees

4  with Oceana.

5  NMFS's argument that Amendment 18 (i.e., "Alternative 1" among the alternatives the

6  agency considered) represents an independent set of management decisions is undermined by the

7  Council's environmental analysis report:  "Alternative 1 represents the status quo relative to the

8  overall management of sardine, and *not any particular recent action* or period."  AR 4459

9  (emphasis added).  NMFS's own characterization of Amendment 18 reflects that the existing

10  harvest control rules form an integral component of the rebuilding plan:  "Alternative 1 would

11  adopt a rebuilding plan maintaining the current management process, harvest control rules, and

12  other FMP provisions currently in place for Pacific sardine."  AR 0008.  "Alternative 1 . . .

13  maintains the Council's annual harvest specifications process for Pacific sardine, such that an OFL

14  and ABC are calculated annually based on an estimate of that year's estimated biomass from

15  annual stock assessments."  *Id.*   Even if, as NMFS argues, the rebuilding plan is an independent

16  agency action, the plan still directly implicates the harvest control rules.  Because the harvest

17  control rules are an integral part of the rebuilding plan, documents produced by or presented to

18  NMFS discussing and analyzing the merits of the harvest control rules and their underlying

19  parameters were necessarily indirectly considered by NMFS.

20  Oceana provides other justifications for including these documents in the record.  For

21  example, Oceana argues that many of these documents were authored by NMFS's own scientists.

22  Dkt. No. 25 at 7, 12, 13, 14, 15; *see also Oceana, Inc. v. Pritzker*, No. 16-CV-06784-LHK, 2017

23  WL 8948945, at *4 (N.D. Cal, Aug. 15, 2017) ("[I]t was not sensible to distinguish between

24  materials considered by NMFS's scientific staff and materials before the individual NMFS

25  employees responsible for developing the [Catch] Rule.") (internal quotation marks and citation

26  omitted).  In addition, Oceana notes that nearly all of these documents were presented to NMFS

27  and discussed at meetings of the PFMC, on which NMFS, as an organization, is a voting member

28  and integral stakeholder.  *See* Dkt. No. 25; *see also In re Delta Smelt Consolidated Cases*,

United States District Court
Northern District of California

1    No. 1:09–CV–1053 OWW DLB, 2010 WL 2520946, at *3 (E.D. Cal, June 21, 2010) (noting

2    "[t]here is ample authority supporting the proposition that the agency must consider relevant data

3    or reports presented to it prior to completion of a biological opinion" and collecting cases).  NMFS

4    does not dispute these points.  *See* Dkt. No. 28.

5          In consideration of the above, the Court grants Oceana's request to add the following

6    documents to the record:

7    • Hurtado-Ferro and Punt, *Revised Analyses Related to Pacific Sardine Harvest
         Parameters* (2014) (March 2014 Council Meeting Briefing Book PDF pgs. 1–42)[4]

8

9    • Draft Environmental Assessment Incorporating the Use of a New Temperature
         Index into the Calculation of the Pacific Sardine Harvest Guideline Formula
10        (Agenda Item E.2.a, November 2014 Council Meeting Briefing Book, PDF pgs.
         23–52)

11

12   • April 2015 Agenda Item J.1, Supplemental Attachment 2 (graph with modeling
         results)

13   • Hurtado-Ferro and Punt, Supplemental University of Washington PowerPoint
         (March 2014 Agenda Item I.1 Briefing Book, PDF pages 43–62) (a PowerPoint
14        presentation that fisheries scientists Dr. Hurtado-Ferro and Dr. Punt presented to
         the Council, explaining the sardine-specific model and its results in simpler terms)
15

16   • Scientific studies and presentations by NMFS's scientists:

17       ○ McClatchie, Sam & Goericke, Ralf & Auad, Guillermo & Hill, Kevin.
            (2010). Re-assessment of the stock-recruit and temperature-recruit
18           relationships for Pacific sardine (Sardinops sagax). Canadian Journal of
            Fisheries and Aquatic Sciences. 67. 1782-1790. 10.1139/F10-101
19

20       ○ Zwolinski, Juan & Demer, David. (2013). Environmental and parental
            control of Pacific sardine (Sardinops sagax) recruitment. ICES Journal of
21           Marine Science. 71. 2198-2207. 10.1093/icesjms/fst173

22       ○ Papers, reports, and presentations submitted by Dr. Zwolinski and Dr.
            Demer for the 2013 Harvest Parameter workshop regarding relationship
23           between temperature indexes and $E_{MSY}$

24   • Council documents discussing the CalCOFI-based $E_{MSY}$:[5]

25

26

27   _____

[4] NMFS says the Hurtado and Punt Report is already in the administrative record.  Dkt. No. 28 at
     8.

28   [5] The Court notes that NMFS acknowledged at least some of these documents analyzing $E_{MSY}$ in

                                           10

- - April 2021 Council Agenda Item E.4.a, SSC Report on Pacific Sardine Assessment, Harvest Specifications and Management Measures, Final Action

  - April 2021 Council Meeting Agenda Item E.4.a, CPSMT Report on Pacific Sardine Assessment, Harvest Specifications, and Management Measures, Final Action

- Documents discussing the 2013 Sardine Harvest Parameter workshop and the soon-to-be adopted CalCOFI temperature index:  the report from the 2013 Sardine Harvest Parameter workshop, and Council discussion about the report contained in the following:

  - The April 2013 Council Meeting Briefing Book Agenda Item I.1

  - The June 2013 Council Meeting Briefing Book Agenda Item I.4

  - The March 2014 Council Meeting Briefing Book Agenda Item I.1

- Nov. 2015 Agenda Item H.1.a: Pacific Sardine Distribution Workshop Report

- David Demer and Juan Zwolinski, *Variations in the spatial distribution of an internationally exploited migrating stock of Pacific sardine (Sardinops sagax) for consideration in the U.S. Harvest Control Rule*, Southwest Fisheries Science Center, NMFS

- Juan Zwolinksi and David Demer, *Sardine Distributions Estimated from Survey, Habitat, and Landings Data, and a Method for Annually Optimizing D in the Harvest Control Rule,* Presentation at the PFMC Workshop on Distribution of the Northern Stock of Sardine, and the Associated Harvest Control Rule (Aug. 17, 2015)

- Juan Zwolinski and David Demer, *Optimizing Fishing Quotas to Meet Target Fishing Fractions of an Internationally Exploited Stock of Pacific Sardine*, North American Journal of Fisheries Management, 34:6, 1119-1130, DOI: 10.1080/02755947.2014.951802

---

its response to public comments on Amendment 18:  "Oceana [cites] recent Council documents and a 2019 scientific paper from NMFS' SWFSC that indicates that the Pacific Decadal Oscillation is a better predictor of sea surface temperature than the currently used 3-year average of California Cooperative Fisheries Investigation (CalCOFI) sea surface temperature measurements. . . . Response: Changing how $E_{MSY}$ is calculated is outside the scope of this action, however NMFS would still like to provide a response to this comment. *NMFS is aware of the scientific publications and ongoing Council discussions related to $E_{MSY}$*, and is committed to participating in these ongoing discussions about new science and whether that new science justifies a change for how $E_{MSY}$ is calculated for management purposes. Regarding recent Council discussion: The Council's Scientific and Statistical Committee (SSC), which is the scientific advisory body responsible for recommending changes to $E_{MSY}$, has the ability to recommend changes to $E_{MSY}$ at any time."  86 Fed. Reg. 33144 (emphasis added).

- Nov. 2015 Agenda Item H.1 Attachment 1, *Oceana vs. Pritzker* Settlement Agreement

- Nov. 2015 Agenda Item H.1.b, CPSMT Report on the Distribution Workshop[6]

- Nov. 2015 Agenda Item H.1.b, Supplemental SSC on the Distribution Workshop

- Decision Summary Document, PFMC, Nov. 2015 Meeting, https://www.pcouncil.org/documents/2015/11/november-2015-decision-document.pdf/

- Meeting Transcript, PFMC November 2015 Meeting Agenda Item H.1, https://www.pcouncil.org/documents/2015/11/november-2015-meeting-recordings.pdf/

- Council Meeting Record, PFMC, November 2015, https://www.pcouncil.org/documents/2015/11/november-2015-meeting-record.pdf/

**C.      Documents Relating to Stock Assessments**

In addition to using harvest control rules in making fishery management decisions, NMFS relies on stock assessments, including estimates and trends of the total biomass of Pacific sardine and catch statistics.  AR 5478 [CPS FMP through Am 17] ("The CPSMT will prepare an annual [Stock Assessment and Fishery Evaluation ("SAFE")] report describing the status of the CPS fishery. The SAFE report provides information to the councils for determining annual harvest levels for each stock, documenting significant trends or changes in the resource, marine ecosystems, and fishery over time, and assessing the relative success of existing state and Federal fishery management programs.").

Oceana requests that several documents relating to stock assessments be added to the record.  Dkt. No. 25 at 10-11 (Section IV.B).  It argues that the stock assessments are a part of the "whole record . . . before the agency," *Portland Audubon Soc'y*, 984 F.2d at 1548, because "NMFS has used the same set of formulas to set catch limits since 2012[, and] NMFS re-adopted this same approach as the rebuilding plan in Am. 18."  *Id.* at 10.  Oceana explains that the stock

---

[6] The Court notes that NMFS acknowledged at least some of these documents analyzing the distribution parameter in its response to public comments on Amendment 18:  "The value for the Distribution parameter in the Pacific sardine harvest control rules has recently been reviewed.  In 2015, a 3-day meeting was held that included agency and non-agency scientists to review the Distribution parameter.  The results of this workshop were then presented to the Council and its advisory bodies, including the SSC."  86 Fed. Reg. 33145.

1   assessments provide "evidence about the adequacy of [NMFS's] catch limit formulas for

2   preventing overfishing and rebuilding the sardine population," *id.*, and contain historical

3   parameters used in the harvest control rules, *id.* at 11.  According to Oceana, these stock

4   assessments were presented to the agency at Council meetings over the past several years.

5           NMFS argues that previous years' stock assessments were not considered in promulgating

6   Amendment 18 because they were superseded by the 2020 stock assessment, on which the agency

7   solely relied in adopting the amendment.  Dkt. No. 28 at 10; *see* AR 6130-318.  NMFS says the

8   2020 stock assessment "includes a large amount of data regarding previous years—showing trends

9   in biomass, landings, catch limits, exploitation rate, and more over the time period Plaintiff

10  requests," and that it would have had no reason to consider its earlier assessments.  Dkt. No. 28 at

11  12; *see also, e.g.*, AR 6188-93; AR 6205.

12          The Court agrees with Oceana that the stock assessments from recent years must be added

13  to the record for two reasons.  *First*, even if NMFS did not directly consider previous years' stock

14  assessments in the form that those assessments were originally presented, the record is not limited

15  to only those documents directly considered by the agency.  *Oceana*, No. 16-cv-06784-LHK

16  (SVK), 2017 WL 2670733, at *4 ("[D]ocuments need not have 'literally passed before the eyes of

17  the decision-makers' in order to be part of the administrative record, . . . a decision-maker can be

18  deemed to have 'constructively considered' materials . . . .") (citation omitted).  NMFS seems to

19  acknowledge that it did consider at least some of the data from these prior assessments to the

20  extent that data was incorporated in the 2020 stock assessment.  Because the premise of

21  Amendment 18 is adoption of a status quo management approach to rebuilding the Pacific sardine

22  population, data reflecting the performance of status quo fishery management practices over time

23  was at least indirectly considered by the agency as part of its regular collection of stock

24  assessment data.

25          *Second*, the stock assessments are comprised of data contained in reports authored by

26  NMFS's own scientists.  For example, three of the four authors of the 2020 stock assessment are

27  affiliated with NMFS Southwest Fisheries Science Center.  *See, e.g.*, AR 6130 [2020 stock

28  assessment].  And these reports were presented to NMFS at meetings of the PFMC, of which

United States District Court
Northern District of California

13

1   NMFS is a key member.   For these reasons, the previous years' stock assessments were before the

2   agency and indirectly considered by it when it selected the status quo alternative for purposes of

3   Amendment 18.  *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. C-06-4884-

4   SI, 2007 WL 3049869 (N.D. Cal. Oct. 18, 2007) (granting request to add documents "compiled

5   and generated by [the Bureau of Land Management] in its self-described "15-year long public

6   planning" process); *In re Delta Smelt Consolidated Cases*, No. 1:09–CV–1053 OWW DLB, 2010

7   WL 2520946, at *3 (noting "[t]here is ample authority supporting the proposition that the agency

8   must consider relevant data or reports presented to it prior to completion of a biological opinion"

9   and collecting cases).

10          Even if the agency did not directly consider the exact data contained in previous years'

11   stock assessments but only considered the data in summary form as part of the 2020 stock

12   assessment, the Court finds that NMFS necessarily indirectly considered these documents in

13   adopting Amendment 18.  Accordingly, the following documents shall be added to the record:

14          • Stock Assessments from 2012 to 2021[7]

15          Oceana also argues that the record should include several "[d]ocuments from [an] April

16   2015 Council Meeting . . . showing that in 2014, the OFL, ABC, and ACLs were seriously inflated

17   due to an error in the 2014 stock assessment . . . ."  Dkt. No. 25 at 11.  Besides the fact that these

18   documents were presented at PFMC council meetings, Oceana provides little other justification for

19   their inclusion in the record.  *See id.*  Oceana says that NMFS must have indirectly considered

20   these documents because in the adoption of Amendment 18 the agency concluded that the Pacific

21   sardine's overfished status is due solely to environmental conditions, not fishing pressure.  Dkt.

22   No. 31 at 9.  They argue that the errors in the 2014 stock assessment show that fishing pressure

23   contributed to the current low level of the sardine stock.  *Id.*  NMFS argues that these documents

24   are irrelevant to whether overfishing will occur under Amendment 18 and that they were therefore

25   not considered by the agency.  Dkt. No. 28 at 13.

26

27   ─────────────────────────

[7] The Court notes that NMFS acknowledged "older stock assessment data" in its response to
28   public comments on Amendment 18:  "The two values that Oceana implies NMFS should
     consider using for $B_{MSY}$ are based on older stock assessment data."  86 Fed. Reg. 33145.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Court agrees with NMFS. Unlike the documents related to the harvest control rules

2    and the data contained in the stock assessments, these documents lack an obvious connection to

3    Amendment 18 that would indicate they were directly or indirectly considered by the agency.

4    **D.    Documents Related to Amendment 17**

5    Oceana argues that documents related to Amendment 17 to the CPS FMP should be part of

6    the administrative record for Amendment 18.  Dkt. No. 25 at 16-17 (Section IV.D).  It argues that

7    a change NMFS made to the fishery management plan when it adopted Amendment 17 removed

8    an "implicit" rebuilding measure from the status quo management approach that forms the basis

9    for Amendment 18.  Specifically, Oceana argues that before Amendment 17, the CPS FMP

10   prohibited all directed fishing, including directed fishing by the live bait fishery, while the sardine

11   population was overfished.  *Id.* at 17.  Oceana argues that this prohibition was among the "implicit

12   rebuilding measures" that NMFS assumed would be in effect when it adopted Amendment 18, and

13   that this assumption was undermined upon the adoption of Amendment 17, which struck the

14   prohibition from the CPS FMP.  *Id.*  Oceana argues that documents associated with Amendment

15   17 and other implicit rebuilding measures necessarily were considered by the agency in adopting

16   Amendment 18.  *Id.* at 17-18.

17   NMFS responds that Amendment 17 is not being challenged in this action and documents

18   associated with that agency action are not part of the record here.  Dkt. No. 28 at 18.  NMFS

19   further argues that Oceana misreads the references to implicit rebuilding measures contained in the

20   CPS FMP.  *Id.* at 19.  Finally, NMFS argues it had "no reason to reach back to these supporting

21   documents when it had new reports from the CPS management team, and new public comments

22   submitted with regard to Amendment 18, which would be more up-to-date and directly relevant to

23   the rebuilding plan."  Dkt. No. 28 at 19.

24   The Court agrees with NMFS.  Oceana has not overcome its burden by providing clear

25   evidence that these documents were directly or indirectly considered by NMFS.  Because

26   Amendment 17 is not being challenged in this action, the Court finds no reason to compel NMFS

27

28

to add documents considered in the course of that amendment to the record here.[8]  *See Portland Audubon Soc'y*, 984 F.2d at 1548 ("The whole record" includes everything that was before the agency pertaining to the *merits of its decision.*") (emphasis added).

### E.    Comment Letters and Non-Specific Requests

Oceana requests that its past comment letters concerning other agency action involving the Pacific sardine and other actions by the Council should be included in the record.[9]  Dkt. No. 25 at 11, 14, 16, 18.  NMFS generally objects to the addition of these other comment letters.  It observes that Oceana, and any organization or member of the public, was "free to submit any comments they wished on Amendment 18."  Dkt. No. 28 at 10, 18.  NMFS represents that all comments submitted with respect to Amendment 18 have already been included in the record.  *Id.* at 10.

The Court agrees that comments and letters concerning other agency actions are not part of the administrative record for Amendment 18.  Accordingly, the Court denies the following requests for addition to the record:

- Oceana's comment letters on the harvest specifications and catch limits NMFS set for sardine through its "annual specifications" process between 2012 and 2021 (Dkt. No. 25 at 11)

- April 2015 Agenda Item J.1.b, Oceana's public comments discussing inflated values used to set catch limits and how overfishing had occurred in 2014 (Dkt. No. 25 at 11)

- April 2015 Agenda Item J.2.b, Oceana's public comments discussing inflated values used to set catch limits and how overfishing occurred in 2014 (Dkt. No. 25 at 11)

- Oceana's comment letters on the harvest specifications and catch limits NMFS set for sardine through its "annual specifications" process between 2014 and 2021 (Dkt. No. 25 at 14)

- Nov. 2015 Agenda Item H.1.c, Oceana's public comments (Dkt. No. 25 at 16)

---

[8] NMFS notes that a strikethrough and underline version, showing additions and deletions made in the course of Amendment 17 to the CPS FMP, is already in the record at AR 2553.  Dkt. No. 28 at 18.

[9] These requests are found throughout Oceana's motion.  *See* Dkt. No. 25.

United States District Court
Northern District of California

- Sept. 2018 Agenda Item C.1.b, Oceana's public comments (Dkt. No. 25 at 18)
- Nov. 2018 Agenda Item E.3.b, containing Oceana's public comments (Dkt. No. 25 at 18)

Oceana also generally requests that "public comments and council documents" from the briefing books of several Council meetings be included in the record.  Dkt. No. 25 at 9-10.  To the extent that these requests are different from or in addition to the document-specific requests addressed elsewhere in this order, Oceana's requests are denied due to their non-specific nature. *City of Duluth*, 968 F. Supp. 2d at 288 ("Plaintiff must identify the materials allegedly omitted from the record with sufficient specificity.").

### F.      Deliberative Materials

Oceana argues that NMFS has omitted from the record materials it considers "deliberative," such as emails, meeting notes, or drafts of documents already in the record, regardless of whether these materials were considered by the agency.  Dkt. No. 25 at 18.  It argues that these materials should be part of the record because "[deliberative] communications may go to the heart of the question of whether an agency action was arbitrary and capricious, an abuse of discretion or otherwise inconsistent with the law under Section 706(2) of the APA."  *Id.* at 21; *see also Desert Survivors v. U.S. Dep't of the Interior*, 231 F.Supp.3d 368, 382 (N.D. Cal. Feb. 6, 2017).  If the agency wishes to exclude these materials because they are protected from disclosure by the deliberative process privilege, Oceana argues that NMFS should be required to produce a reviewable privilege log.  Dkt. No. 25 at 21.

NMFS acknowledges that it omitted "deliberative" documents from the record, but argues that these documents are not properly part of the record.  Dkt. No. 28 at 20.  In support of its argument, NMFS cites a decision from the D.C. Circuit, *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 789 F.2d 26 (D.C. Cir. 1986).  In that case, the D.C. Circuit held that deliberative materials are outside the scope of APA review and not part of the administrative record, analogizing the deliberations of the agency to those of a judge's chambers.  *Id.* at 45.

The D.C. Circuit's views notwithstanding, NMFS's arguments are not consistent with the decisions of district courts in the Ninth Circuit.  As Judge Chhabria of this district has observed,

1     "[i]t is obvious that in many cases internal comments, draft reports, inter– or intra-agency emails,

2     revisions, memoranda, or meeting notes will inform an agency's final decision.  Therefore, the

3     government is wrong to assert that these types of materials, as a categorical matter, should be

4     excluded from the universe of materials 'directly or indirectly considered by agency decision-

5     makers.'"  *Inst. for Fisheries Res. v. Burwell*, Case No. 16-cv-01574-VC, 2017 WL 89003, at *1

6     (N.D. Cal. Jan. 10, 2017); *see also, e.g. Ctr. for Env't Health v. Perdue*, Case No. 18-cv- 01763-

7     RS, 2019 WL 3852493, at *2 (N.D. Cal. May 6, 2019); *Ctr. for Food Safety*, 2017 WL 1709318,

8     at *4; *In re Clean Water Act Rulemaking*, No. C 20-04636 WHA, 2020 WL 6686370, at *2 (N.D.

9     Cal. Nov. 12, 2020); *WildEarth Guardians v. Bernhardt*, 507 F. Supp. 3d 1219, 1225 (C.D. Cal.

10    2020); *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. CV 18-716-GW(SSX), 2018

11    WL 5919218, at *6 (C.D. Cal. Sept. 17, 2018).  This Court agrees that if the agency wishes to

12    invoke the deliberative process privilege for any materials that were considered by the agency, it

13    must submit a privilege log.  *See Inst. for Fisheries Res*, No. 16-cv-01574-VC, 2017 WL 89003, at

14    *1 ("[T]he scope of the privilege doesn't define the scope of the material directly or indirectly

15    considered. If a privilege applies, the proper strategy isn't pretending the protected material wasn't

16    considered, but withholding or redacting the protected material and then logging the privilege.").

17           Accordingly, NMFS must either add these "deliberative" materials to the record or produce

18    a log of any documents withheld on the ground that they are protected from disclosure by the

19    deliberative process privilege or by some other privilege or protection.

20           **G.      Exceptions to Record Review Rule**

21           Oceana argues that any materials the Court does not find are part of the record should be

22    provided to supplement the record instead.  Dkt. No. 25 at 22.

23           The Ninth Circuit recognizes four exceptions to record review.  Extra-record evidence may

24    be considered where it (1) is necessary to determine "whether the agency has considered all

25    relevant factors and has explained its decision," (2) is necessary to determine whether "the agency

26    has relied on documents not in the record," (3) "when supplementing the record is necessary to

27    explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of

28    agency bad faith."  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir.

United States District Court
Northern District of California

18

2014) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004)).

Oceana argues that, here, the "relevant factors" exception applies. Dkt. No. 28 at 24. The relevant factors exception "applies when defendants failed to consider a general subject matter that proves demonstrably relevant to the outcome of the agency's decision. . . . The exception fails to apply when the agency omitted specific hypotheses and/or conclusions from consideration." *Gallatin Wildlife Ass'n v. U.S. Forest Serv.*, No. CV-15-27-BU-BMM, 2016 WL 6684195, at *2 (D. Mont. Mar. 9, 2016) (internal quotation marks omitted).

The Court need not decide whether the relevant factors exception applies at this time. As NMFS notes, whether an exception to the record review rule applies may best be determined after the parties have submitted briefing on the merits of this matter. *See* Dkt. No. 28 at 28. Oceana does not object. Dkt. No. 31 at 15 ("[I]f the Court agrees with NMFS's invitation to allow Oceana to cite and attach these materials to its briefs for the purpose of illustrating relevant factors NMFS did not consider, Oceana does not object to that approach."). Accordingly, the Court will not order any documents added under an exception to the record review rule at this time, but will permit Oceana to make the case that these materials should be considered as supplementary evidence when the parties brief cross-motions for summary judgment.

## IV.    CONCLUSION

The Court orders NMFS to complete the administrative record and to produce a log of documents withheld from the record on privilege grounds, if any, in accordance with the above discussion by **January 13, 2023**.[10]

The parties shall confer and then advise the Court of their preferred schedule for briefing on the merits of this matter by **December 2, 2022**.

**IT IS SO ORDERED.**

Dated: November 23, 2022

VIRGINIA K. DEMARCHI
United States Magistrate Judge

United States District Court
Northern District of California

---

[10] The documents that must be added to the administrative record are summarized in Appendix I.

**APPENDIX I**

**DOCUMENTS TO BE ADDED TO THE ADMINISTRATIVE RECORD**

- Hurtado-Ferro and Punt, *Revised Analyses Related to Pacific Sardine Harvest Parameters* (2014) (March 2014 Council Meeting Briefing Book PDF pgs. 1–42)

- Draft Environmental Assessment Incorporating the Use of a New Temperature Index into the Calculation of the Pacific Sardine Harvest Guideline Formula (Agenda Item E.2.a, November 2014 Council Meeting Briefing Book, PDF pgs. 23–52)

- April 2015 Agenda Item J.1, Supplemental Attachment 2 (graph with modeling results)

- Hurtado-Ferro and Punt, Supplemental University of Washington PowerPoint (March 2014 Agenda Item I.1 Briefing Book, PDF pages 43–62) (a PowerPoint presentation that fisheries scientists Dr. Hurtado-Ferro and Dr. Punt presented to the Council, explaining the sardine-specific model and its results in simpler terms)

- Scientific studies and presentations by NMFS's scientists:

    o McClatchie, Sam & Goericke, Ralf & Auad, Guillermo & Hill, Kevin. (2010). Re-assessment of the stock-recruit and temperature-recruit relationships for Pacific sardine (Sardinops sagax). Canadian Journal of Fisheries and Aquatic Sciences. 67. 1782-1790. 10.1139/F10-101

    o Zwolinski, Juan & Demer, David. (2013). Environmental and parental control of Pacific sardine (Sardinops sagax) recruitment. ICES Journal of Marine Science. 71. 2198-2207. 10.1093/icesjms/fst173

    o Papers, reports, and presentations submitted by Dr. Zwolinski and Dr. Demer for the 2013 Harvest Parameter workshop regarding relationship between temperature indexes and $E_{MSY}$

- Council documents discussing the CalCOFI-based $E_{MSY}$:

    o April 2021 Council Agenda Item E.4.a, SSC Report on Pacific Sardine Assessment, Harvest Specifications and Management Measures, Final Action

    o April 2021 Council Meeting Agenda Item E.4.a, CPSMT Report on Pacific Sardine Assessment, Harvest Specifications, and Management Measures, Final Action

- Documents discussing the 2013 Sardine Harvest Parameter workshop and the soon-to-be adopted CalCOFI temperature index:  the report from the 2013 Sardine Harvest Parameter workshop, and Council discussion about the report contained in the following:

- The April 2013 Council Meeting Briefing Book Agenda Item I.1

- The June 2013 Council Meeting Briefing Book Agenda Item I.4

- The March 2014 Council Meeting Briefing Book Agenda Item I.1

- Nov. 2015 Agenda Item H.1.a: Pacific Sardine Distribution Workshop Report

- David Demer and Juan Zwolinski, *Variations in the spatial distribution of an internationally exploited migrating stock of Pacific sardine (Sardinops sagax) for consideration in the U.S. Harvest Control Rule*, Southwest Fisheries Science Center, NMFS

- Juan Zwolinksi and David Demer, *Sardine Distributions Estimated from Survey, Habitat, and Landings Data, and a Method for Annually Optimizing D in the Harvest Control Rule,* Presentation at the PFMC Workshop on Distribution of the Northern Stock of Sardine, and the Associated Harvest Control Rule (Aug. 17, 2015)

- Juan Zwolinski and David Demer, *Optimizing Fishing Quotas to Meet Target Fishing Fractions of an Internationally Exploited Stock of Pacific Sardine*, North American Journal of Fisheries Management, 34:6, 1119-1130, DOI: 10.1080/02755947.2014.951802

- Nov. 2015 Agenda Item H.1 Attachment 1, Oceana vs. Pritzker Settlement Agreement

- Nov. 2015 Agenda Item H.1.b, CPSMT Report on the Distribution Workshop

- Nov. 2015 Agenda Item H.1.b, Supplemental SSC on the Distribution Workshop

- Decision Summary Document, PFMC, Nov. 2015 Meeting, https://www.pcouncil.org/documents/2015/11/november-2015-decision-document.pdf/

- Meeting Transcript, PFMC November 2015 Meeting Agenda Item H.1, https://www.pcouncil.org/documents/2015/11/november-2015-meeting-recordings.pdf/

- Council Meeting Record, PFMC, November 2015, https://www.pcouncil.org/documents/2015/11/november-2015-meeting-record.pdf/

- Stock Assessments from 2012 to 2021